# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., | ) ) ) ) | CASE NO. 5:25-cv-707 |
| Plaintiff, | ) ) | CHIEF JUDGE SARA LIOI |
| vs. | ) ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| THE DAVEY TREE EXPERT COMPANY, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") and third-party defendant/counterclaimant XL Insurance America, Inc. ("XL," and collectively, "insurers") are insurance companies that issued policies to The Davey Tree Expert Company ("Davey Tree") and Wolf Tree, Inc. ("Wolf Tree") (collectively, "insureds"). National Union and XL issued a commercial umbrella policy ("the Umbrella Policy") and excess liability policy ("the Excess Liability Policy"), respectively, to Davey Tree. (Doc. No. 23-7 (Umbrella Policy); Doc. No. 23-8 (Excess Liability Policy).) Now before the Court are National Union's and XL's motions for judgment on the pleadings. (Doc. No. 50 (National Union Motion); Doc. No. 51 (XL Motion).) The insureds oppose both motions. (*See generally* Doc. No. 56 (Insureds' Opposition).)

For the reasons set forth below, National Union's and XL's motions for judgment on the pleadings (Doc. No. 50; Doc. No. 51) are **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND[1]

### A.  Factual Background

The underlying facts giving rise to this declaratory action involve the alleged murder of Wolf Tree employee Eliud Montoya ("Montoya"). Montoya was a Georgia-based employee of Davey Tree's wholly-owned subsidiary, Wolf Tree. (Doc. No. 23-1 (*Montoya* Original Compl.) ¶¶ 7, 18; Doc. No. 23-5 (*Huffman* Amended Compl.) ¶¶ 6, 38.)[2] Wolf Tree and Davey Tree operate a business that trims trees along power lines for utility companies. (Doc. No. 23-5 ¶ 16.) Montoya had worked for Wolf Tree as a tree trimmer and team leader for ten years, working with a crew of approximately thirty workers. (Doc. No. 23-1 ¶¶ 18–19; Doc. No. 23-5 ¶ 38.) Montoya's supervisor was Pablo Rangel ("Rangel"), an employee of Wolf Tree. (Doc. No. 23-1 ¶ 20; *see* Doc. No. 23-5 ¶ 16.) Rangel allegedly supplied undocumented employees with falsified identification documents in exchange for money, skimmed money out of their paychecks, and traveled site to site with firearms to invoke fear among his workforce. (Doc. No. 23-1 ¶¶ 22–27; Doc. No. 23-5 ¶¶ 20, 22–26, 36.) Montoya reported Rangel's conduct to Davey Tree twice, first in March 2016

---

[1] On a Rule 12(c) motion seeking the *dismissal of a non-movant's claim*, the Court assesses whether the non-movant's complaint "contain[s] direct or inferential allegations respecting all the material elements under some viable legal theory." *Hindel v. Husted*, 875 F.3d 344, 346–47 (6th Cir. 2017) (citations omitted). But when a Rule 12(c) motion seeks *affirmative judgment on the movant's own claim*, the Court instead assesses whether there exists any dispute of material fact that should prevent the Court from immediately awarding the movant's desired relief. *City of Gallatin v. Gallatin Data Centers, LLC*, No. 3:24-cv-868, 2026 WL 810271, at *7 (M.D. Tenn. Mar. 24, 2026) (citation omitted).

Here, both analyses largely depend on the allegations of the underlying *Montoya* and *Huffman* pleadings and the language of the relevant contracts, all of which are incorporated into the relevant pleadings. (*See* Doc. No. 21 (National Union First Amended Compl.) ¶¶ 38–42; Doc. No. 44 (XL's Amended Answer and Counterclaim), at 15–16; Doc. No. 23 (Insureds' First Amended Answer, Counterclaim, and Third-Party Compl.), at 63–67 (All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system).) Accordingly, the Court's discussion of the facts will refer to the factual allegations of the underlying *Montoya* and *Huffman* pleadings.

[2] Maria Montoya later filed an amended complaint in this action. (Doc. No. 23-3 (*Montoya* Amended Compl.).) Although an amended complaint generally supersedes the original complaint, *see Mustin v. Guiller*, 563 F. Supp. 3d 715, 721 (N.D. Ohio 2021), Maria Montoya's amended complaint incorporates by reference most of the allegations alleged in her original complaint (Doc. No. 23-3 ¶ 2).

and again in April 2017. (Doc. No. 23-1 ¶¶ 31–32; Doc. No. 23-5 ¶¶ 43–45, 49–51.) It is claimed that Davey Tree General Counsel Marjorie Conner[3] ("Conner") did not conduct an internal investigation of Rangel's illicit activities. (*See* Doc. No. 23-1 ¶ 34; Doc. No. 23-5 ¶¶ 48, 55.) Rather, Conner forwarded Montoya's April 2017 report to Wolf Tree area manager Christopher Branch ("Branch"). (Doc. No. 23-1 ¶ 34.) Branch was employed by Wolf Tree and supervised Rangel. (Doc. No. 23-1 ¶¶ 34–35; Doc. No. 23-5 ¶ 8.) Branch forwarded Montoya's report to Rangel. (Doc. No. 23-1 ¶ 34; Doc. No. 23-5 ¶ 56.) Rangel then allegedly shared Montoya's report among all Savannah-area Wolf Tree employees. (Doc. No. 23-5 ¶¶ 60–61.) Montoya, perceiving Rangel's actions to be threatening and retaliatory, reported Rangel to Davey Tree. (*Id.* ¶ 62.)

Rather than terminate Rangel, Davey Tree reassigned Montoya so that he was placed under the direct supervision of Oscar Cruz ("Cruz"), who "acted as [Rangel's] conduit." (Doc. No. 23-1 ¶¶ 40–42.) Cruz was employed by Wolf Tree as a supervisor. (*See id.* ¶ 42.) Soon after his reassignment, Montoya was allegedly subjected to a variety of hostile actions by Cruz, who created a "paper trail" of fabricated safety violations committed by Montoya. (*Id.* ¶¶ 42–45; Doc. No. 23-5 ¶¶ 68–69.) As a result of these fictitious violations, Montoya was suspended from work on or about August 16, 2017. (Doc. No. 23-1 ¶ 46; Doc. No. 23-5 ¶¶ 79–81.) On August 17, 2017, the first day of his suspension, Montoya filed a formal complaint with the EEOC. (Doc. No. 23-1 ¶ 47; Doc. No. 23-5 ¶ 84.) EEOC personnel informed Montoya that his employer would receive notice of his complaint upon filing. (Doc. No. 23-1 ¶ 48; *see* Doc. No. 23-5 ¶ 85.) Then, just two

---

[3] The *Montoya* complaint further alleges that Conner served as Secretary for Wolf Tree. (Doc. No. 23-1 ¶ 33.)

days later on August 19, 2017, Montoya was allegedly murdered in front of his home. (Doc. No. 23-1 ¶ 49; Doc. No. 23-5 ¶ 87.)[4]

**B. The Underlying Suits**

In the wake of Montoya's death, two legal actions were brought against the insureds: *Montoya* and *Huffman* (collectively, "underlying suits" or "underlying actions"). Both cases involve substantially the same facts (*see generally* Doc. No. 23-1; Doc. No. 23-2 (*Huffman* Original Compl.); Doc. No. 23-3; Doc. No. 23-5) but allege different causes of action.

> 1.  *Montoya v. The Davey Tree Expert Company, et al. (State Court of Chatham County, Ga.)*

On November 9, 2017, Maria Montoya, the surviving spouse of Eliud Montoya, brought an action against defendants Davey Tree, Wolf Tree, Conner, Branch, Cruz, and Rangel in the State Court of Chatham County, Georgia. (*See generally* Doc. No. 23-1.)

Specific to the claims against Davey Tree and Wolf Tree, Maria Montoya alleged that Davey Tree and Wolf Tree had a duty to provide Montoya with a safe work environment, to adequately review and address Montoya's complaints, and to protect Montoya's identity from unauthorized disclosure to other employees of Davey Tree and Wolf Tree. (Doc. No. 23-3 ¶¶ 17–20.) Davey Tree and Wolf Tree breached this duty by: (i) improperly disclosing Montoya's identity as the source of the complaints raised to Davey Tree and Wolf Tree; (ii) failing to conduct an adequate investigation into Montoya's complaints; and (iii) failing to protect Montoya from

---

[4] Although not considered in the Court's analysis, the Court notes that Rangel was later convicted of conspiracy to conceal illegal aliens, money laundering, money laundering conspiracy, and aiding and abetting retaliation against a witness. Judgment, *United States v. Rangel-Rubio*, No. 4:18-cr-274 (S.D. Ga. Nov. 21, 2022), ECF No. 712; Judgment, *United States v. Rangel-Rubio*, No. 4:22-cr-30 (S.D. Ga. Nov. 21, 2022), ECF No. 33. In his plea agreement, Rangel admits to many of the factual allegations contained in the underlying *Montoya* and *Huffman* complaints. *See generally* Plea Agreement, *United States v. Rangel-Rubio*, No. 4:22-cr-30 (S.D. Ga. Mar. 3, 2022), ECF No. 17.

foreseeable acts of retaliation and violence occasioned by the conduct of their employees. (*Id.* ¶ 19.) Maria Montoya also alleged that Davey Tree and Wolf Tree had a duty to exercise reasonable care in the selection of employees. (Doc. No. 23-1 ¶¶ 84–85.) Davey Tree and Wolf Tree allegedly breached this duty by hiring Rangel, an individual who was not legally authorized to work in the United States and had a history of criminal activity. (*Id.* ¶¶ 89–90.) Maria Montoya claims that Davey Tree and Wolf Tree's conduct resulted in Montoya's murder. (*See generally* Doc. No. 23-1; Doc. No. 23-3.)

The *Montoya* action went to trial and a judgment was entered on June 11, 2025, awarding Maria Montoya compensatory damages of $3.1 million and attorney's fees of $2,351,311.50, apportioning fault 90 percent to defendants and 10 percent to Montoya. (Doc. No. 23, at 18.)

> 2.      *Huffman v. The Davey Tree Expert Company, et al. (State Court of Chatham County, Ga.)*

On July 3, 2018, Brian Joseph Huffman, the administrator of the Montoya Estate, brought an action against Davey Tree, Wolf Tree, Conner, Branch, Cruz, and Rangel in the State Court of Chatham County, Georgia. (*See generally* Doc. No. 23-2.) The case was subsequently removed to the Southern District of Georgia. (Doc. No. 23-5 ¶ 12.) The *Huffman* action alleges claims based on substantially the same facts as *Montoya*.

On March 3, 2025, the Southern District of Georgia dismissed some, but not all, of the claims. (*See generally* Doc. No. 23-6 (*Huffman* Order).) On March 25, 2026, the case was remanded to the State Court of Chatham County. *See* Judgment, *Huffman v. The Davey Tree Expert Co.*, No. 4:18-cv-184 (S.D. Ga. Mar. 25, 2026), ECF No. 387.

## C. The Insurance Policies

At the time of Montoya's death, Davey Tree and Wolf Tree were insured with a commercial umbrella liability policy issued by National Union. (Doc. No. 21 ¶ 1; Doc. No. 23, at 2, 20; Doc. No. 32 (National Union Answer to Counterclaim), at 1; *see generally* Doc. No. 23-7.)[5] Davey Tree was also insured with an excess liability policy issued by XL Insurance America, Inc. (Doc. No. 23, at 82–83; Doc. No. 44 ¶ 9; *see generally* Doc. No. 23-8.)[6]

### 1.  *National Union's Umbrella Policy*

From September 1, 2016, to September 1, 2017, Davey Tree and Wolf Tree were insured by a commercial umbrella policy issued by National Union.[7] (Doc. No. 23-7, at 5, 77.) An umbrella policy is a type of insurance policy that increases the amount of coverage beyond the limits of an underlying primary policy, although it may also fill gaps in primary coverage. 46 C.J.S. *Insurance* § 1627 (2026).

The Umbrella Policy issued by National Union "applies only in excess of the Retained Limit[,]" with Retained Limit referring to "(1) the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or (2) the Self-Insured Retention applicable to each Occurrence[8] that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured."

---

[5] National Union and the insureds incorporate the Umbrella Policy (Doc. No. 21-1; Doc. No. 23-7) in their respective pleadings.

[6] XL and the insureds incorporate the Excess Liability Policy (Doc. No. 23-8) in their respective pleadings.

[7] The "Named Insured" was originally identified as The Davey Tree Expert Company. (Doc. No. 23-7, at 5.) In Endorsement No. 22, however, the policy was amended to add several other Named Insureds, including Wolf Tree, Inc. (*Id.* at 77.)

[8] "Occurrence" means "as respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence." (Doc. No. 23-7, at 26.)

(Doc. No. 23-7, at 9, 28 (citation modified).) With respect to "General Liability (Other Than Wild Fire Liability [in] California, Oregon, [or] Washington State)," the Retained Limit is listed as $12,500,000 for each occurrence and $17,500,000 in the general aggregate. (*Id.* at 76.)

Once the Retained Limit has been exhausted, National Union has a duty to indemnify the insureds as follows:

> [National Union] will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury to which this insurance applies or because of Bodily Injury or Property Damage to which this insurance applies assumed by the Insured under an Insured Contract.

(*Id.* at 6.) "Bodily Injury" is defined as "bodily injury, sickness, disability or disease, *including death*[.]" (*Id.* at 79 (emphasis added).)

The Umbrella Policy also outlines National Union's defense obligations. This provision has been reproduced, in part, below:

> [National Union] will have the right and duty to defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy, even if the Suit is groundless, false, or fraudulent when the applicable limits listed in the Schedule of Retained Limits have been exhausted by payment of Loss to which this policy applies.

(*Id.* at 72–73 (hereafter referred to as "the Defense Provision").)

Various provisions in the Umbrella Policy restrict coverage. (*Id.* at 6.) The Umbrella Policy lists nineteen exclusions. (*Id.* at 10–18.) Relevant to this dispute is the Employment Practices Exclusion ("the ERP Exclusion"), as follows:

> This insurance does not apply to any liability arising out of: 1. failure to hire any prospective employee or any applicant for employment; 2. dismissal, discharge or termination of any employee; 3. failure to promote or advance any employee; or 4. employment-related practices, policies, acts, omissions or misrepresentations *directed at a present, past, future or prospective employee*, including, but not

limited to: a. coercion, harassment, humiliation or discrimination; b. demotion, evaluation, reassignment, discipline, or retaliation; c. libel, slander, humiliation, defamation, or invasion of privacy; or d. violation of civil rights.

This exclusion applies: 1. whether the Insured may be liable *as an employer or in any other capacity*; and 2. to any obligation to share damages with or repay someone else who must pay damages because of the injury.

(*Id.* at 12 (emphasis added).)

The Umbrella Policy also has a "Separation of Insureds"[9] provision which states:

Except with respect to the Limits of Insurance of this policy and rights or duties specifically assigned to the first Named Insured designated in Item 1[] of the Declarations, this insurance applies: 1. as if each Named Insured were the only Named Insured; and 2. separately to each Insured against whom claim is made or Suit is brought.

(*Id.* at 21 (hereafter referred to as "the Separation of Insureds Provision").) Both Davey Tree and Wolf Tree are listed as Named Insured(s), among others, in the Umbrella Policy. (*Id.* at 77.) The Limits of Insurance refers to "the most [National Union] will pay for all damages under [the Umbrella Policy] regardless of the number of: 1. Insureds; 2. claims made or Suits brought; 3. persons or organizations making claims or bringing Suits; or 4. coverages provided under [the Umbrella Policy]." (*Id.* at 8.) The Limits of Insurance are further specified as $23,000,000 for each occurrence and $23,000,000 in the general aggregate. (*Id.* at 5.)

---

[9] "Separation of Insureds" provisions are also commonly referred to as "severability" clauses. *See* Kevin M. Young, et al., *Ohio Insurance Coverage* § 8:6 (2025). Regardless of the label used, "[t]he intent . . . is to provide each insured with separate coverage, as if each were separately insured with a distinct policy, subject to the liability limits of the policy." *Safeco Ins. Co. of Am. v. White*, 913 N.E.2d 426, 440 (Ohio 2009) (O'Donnell, J., concurring) (citations omitted).

2.      *XL's Excess Liability Policy*

In addition to the Umbrella Policy issued by National Union, Davey Tree[10] was also issued an excess liability policy by XL which was effective from September 1, 2016, to September 1, 2017. (Doc. No. 23-8.) An excess liability policy is a type of insurance policy that increases the amount of coverage available to compensate for a loss but does not typically broaden the underlying coverage. *See* Douglas R. Richmond, *Rights and Responsibilities of Excess Insurers*, 78 Denv. U. L. Rev. 29, 30 (2000).

The Excess Liability Policy obligates XL to "pay on [Davey Tree's] behalf all 'Loss' that [Davey Tree] become[s] legally obligated to pay in excess of all 'Underlying Insurance[.]'" (Doc. No. 23-8, at 24.) "The amount [XL] will pay for 'Loss' is limited [to $10,000,000 for each occurrence and $10,000,000 in the general aggregate]." (*Id.* at 10, 14.)

In addition, the Excess Liability Policy states that:

> [XL] will assume the defense of a suit brought against the 'Insured' seeking damages to which this policy applies: 1. If all insurers providing the 'Underlying Insurance' were obligated by the terms and conditions of their policies to assume the defense of such suit; 2. All 'Underlying Insurance' provides for the actual payment of 'Loss' by [Davey Tree] or the insurers providing the 'Underlying Insurance'; and 3. The actual payment of 'Loss' to which this policy applies by [Davey Tree] or the insurers providing the 'Underlying Insurance' exceeds the limits of insurance of the 'Underlying Insurance'.

(*Id.* at 24–25.)

XL's obligations under the Excess Liability Policy are subject to certain restrictions. (*Id.* at 14.) One such restriction is that:

---

[10] The Excess Liability Policy lists The Davey Tree Expert Company as the only Named Insured. (Doc. No. 23-8, at 10.) But the Excess Liability Policy defines "Insured" to mean "each entity or person which is insured under all 'Underlying Insurance' in the same capacity as which such insurance is afforded." (*Id.* at 19.) Because the Underlying Insurance—the Umbrella Policy issued by National Union—identifies Wolf Tree as an Insured (*see* Doc. No. 23-7, at 5, 77), the Excess Liability Policy also extends coverage to Wolf Tree.

> The terms conditions, definitions, limitations and exclusions of the 'Controlling Underlying Policy,' as shown in the Schedule of 'Underlying Insurance,' in effect at the inception date of this policy, apply to this policy unless they are inconsistent with the provisions of this policy. Insurance provided by this policy will not be broader than the insurance provided by the 'Underlying Insurance'.

(*Id.*) The "Controlling Underlying Policy" and "Underlying Insurance" is identified as the Umbrella Policy issued by National Union with a policy period from September 1, 2016, to September 1, 2017. (*Id.* at 13.)

### D. Procedural History

On April 8, 2025, insurer National Union filed this action against its insured Davey Tree, as well as Wolf Tree, Conner, Branch, and Cruz, seeking declarations that National Union has no duty to defend or indemnify against the claims brought against the defendants in *Montoya* and *Huffman* based on the terms of the Umbrella Policy. (Doc. No. 1 (Original Compl.).) On May 28, 2025, National Union and the insureds jointly moved to voluntarily dismiss Conner, Branch, and Cruz. (Doc. No. 18 (Joint Motion).) The Court granted the motion (Doc. No. 19 (Order)), and National Union filed an amended complaint on June 12, 2025 (Doc. No. 21). The amended complaint seeks: (i) a declaratory judgment against the insureds that National Union has no duty to defend or indemnify Davey Tree, Wolf Tree, Conner, Branch, or Cruz under the Umbrella Policy for the claims and liabilities related to the underlying suits (Count I); (ii) a declaratory judgment that National Union has no duty to indemnify or otherwise reimburse the insureds for payments made in connection with the defense of the defended individuals in the underlying lawsuits (Count II); (iii) a declaratory judgment that no payments the insureds have made or liabilities they have incurred or may incur in the future in connection with the underlying suits erode the per occurrence and/or aggregate Retained Limit of the Policy (Count III); and (iv)

10

reimbursement or recovery from the insureds for all payments made to them under the Umbrella Policy to the extent they were not covered under any duty to defend or indemnify (Count IV). (*Id.* at 15–28.)

On June 3, 2025, the insureds filed their answer to National Union's amended complaint, asserting claims against third-party defendant XL and counterclaims against National Union. (Doc. No. 23.) Specifically, the insureds' counterclaims against National Union seek: (i) a declaratory judgment that the Retained Limit of the Umbrella Policy has been exhausted by Davey Tree's payments in the underlying suits and that National Union must defend and indemnify Davey Tree, Wolf Tree, Conner, Branch, and Cruz for expenses incurred from the underlying suits which exceeds the Retained Limit (Count I); (ii) damages resulting from National Union's breach of the Umbrella Policy by failing to defend or indemnify the insureds in the underlying suits (Count II); (iii) a declaratory judgment that National Union has no right to recoup defense expenses paid to Davey Tree in connection with the underlying suits that are not covered by the Umbrella Policy (Count III); and (iv) compensatory and punitive damages and attorney fees in connection with National Union's breach of its duty to act reasonably and in good faith with the insureds (Count IV). (*Id.* at 76–80.) The insureds also bring third-party claims against XL seeking: (i) a declaratory judgment that XL must defend and indemnify Davey Tree, Wolf Tree, Conner, Branch, and Cruz for losses incurred in the underlying suits that are in excess of the Umbrella Policy and within the limits of the Excess Policy (Count I); and (ii) damages resulting from XL's breach of the Excess Policy by failing to defend or indemnify the insureds in the underlying suits (Count II). (*Id.* at 88–91.)

XL responded to the insureds' third-party complaint and asserted a counterclaim seeking a declaratory judgment that the Retained Limits underlying the Excess Liability Policy have not been properly exhausted and that coverage is barred in connection with the underlying suits (Count I). (Doc. No. 44, at 16–17.)

On July 3, 2025, the insureds filed a motion to decline jurisdiction over the declaratory judgment counts and to stay all proceedings until the resolution of the underlying actions. (Doc. No. 22 (Motion to Stay).) On November 24, 2025, the Court denied the insureds' motion. (Doc. No. 48 (Memorandum Opinion and Order).)

On January 9, 2026, National Union and XL both filed separate motions for judgment on the pleadings. (Doc. No. 50; Doc. No. 51.) National Union's motion seeks judgment on the pleadings "as to Count I of its First Amended Complaint, and, solely with respect to the Underlying Actions, as to Counts I, II, and IV of Defendants' Counterclaims." (Doc. No. 50-1 (National Union Memorandum in Support), at 9 (citations omitted).) XL's motion seeks judgment on the pleadings "as to its Counterclaim for Declaratory Judgment [] and as to Counts I and II of the Third-Party Complaint of Defendants . . . solely with respect to the underlying civil actions[.]" (Doc. No. 51-1 (XL Memorandum in Support), at 1 (citations omitted).) On February 20, 2026, the insureds filed their response (Doc. No. 56), and on March 27, 2026, National Union and XL filed their replies (Doc. No. 58 (National Union Reply); Doc. No. 59 (XL Reply)).

## II.    LEGAL STANDARD

Fed. R. Civ. P. 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." When defendants move for judgment on the claims against them, the standard of review for a motion for judgment on the

pleadings is generally the same as for a motion to dismiss for failure to state a claim for relief under Rule 12(b)(6). *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (citation omitted). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (quotation marks and citation omitted). The district court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (citation omitted).

To survive a defendant's motion for judgment on the pleadings, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quotation marks and citations omitted) (emphasis in original). "The motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991) (citation omitted).

The Rule 12(c) analysis is slightly different when a claimant is the movant. When a claimant moves for judgment on the pleadings, they challenge the sufficiency of the defendant's

answer. *Gallatin Data Centers*, 2026 WL 810271, at \*7. The Court's analysis then becomes "whether the [claimant's] petition, stripped of those allegations which are denied by the [non-movant's] answer, would leave the petition stating a cause of action against the defendant." *United Food & Com. Workers, Loc. 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022) (citations omitted). A claimant's motion for judgment on the pleadings may only be granted if, "[a]fter . . . accept[ing] the answer's well-pleaded allegations as true and constru[ing] the pleadings and exhibits in a light most favorable to the [non-movant] . . . the [claimant] is nevertheless clearly entitled to judgment." *Id.* (quotation marks and citations omitted).

In ruling on a Rule 12(c) motion, the Court considers all available pleadings and may also consider: "(1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion for judgment on the pleadings that are referred to in the complaint and are central to the [non-movant's] allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice." *Dudek v. Thomas & Thomas Att'ys & Couns. at L., LLC*, 702 F. Supp. 2d 826, 832 (N.D. Ohio 2010) (citations omitted).

## III.    DISCUSSION

Here, the insurers seek judgment on the pleadings as to both their own claims and claims brought against them. As discussed above, this would normally require two separate analyses: one analyzing the non-movant's pleading to assess whether it states a claim, *see Winget*, 510 F.3d at 581 (citation omitted), and one analyzing the movants' pleadings against the non-movant's answer to assess whether the movant is entitled to the relief requested, *see Kroger Co.*, 51 F.4th at 202 (citations omitted). Here, however, resolution of the motions as to the declaratory judgment

counts[11] turns entirely on a common legal issue: the interpretation of the Umbrella Policy, the Excess Liability Policy, and the complaints in the underlying *Montoya* and *Huffman* actions. Accordingly, the Court can assess the declaratory judgment counts together in a single analysis. As appropriate, the Court provides a separate analysis for Counts II (Breach of Contract) and IV (Bad Faith) of the insureds' counterclaim against National Union and Count II (Breach of Contract) of the insureds' third-party complaint against XL.

### A. Declaratory Judgment Counts

#### 1. Choice-of-Law

The Court begins its analysis by first identifying the governing law for interpreting the two insurance policies. "[A] federal court sitting in diversity borrows the forum State's choice-of-law rule." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115, 142 S. Ct. 1502, 212 L. Ed. 2d 451 (2022) (citation omitted). The Court therefore looks to the choice-of-law rules of Ohio.

Under Ohio choice-of-law rules, "an actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertaken." *Dharamsi v. Nationwide Mut. Ins. Co.*, 540 F. Supp. 3d 749, 753 (S.D. Ohio 2021) (citation omitted). "[T]he party asserting the application of the foreign law has the initial burden to demonstrate such a conflict." *Cross v. Carnes*, 724 N.E.2d 828, 836 (Ohio Ct. App. 1998) (citation omitted). "Where the party seeking the application of foreign law fails to demonstrate a conflict, Ohio law governs." *Gouge v. BAX Glob., Inc.*, 252 F. Supp. 2d 509, 521 (N.D. Ohio 2003) (citations omitted); *see*

---

[11] The declaratory judgment counts encompass Count I (Duty to Defend and Indemnify) of National Union's first amended complaint, Count I (Duty to Defend and Indemnify) of the insureds' counterclaim, Count I (Duty to Defend and Indemnify) of the insureds' third-party complaint, and Count I (Duty to Defend and Indemnify) of XL's counterclaim.

*Hayslip v. Genuine Parts Co.*, 420 F. Supp. 3d 666, 675 (S.D. Ohio 2019); *Dharamsi*, 540 F. Supp. 3d at 753–74.

Here, the parties do not meaningfully dispute the application of Ohio law as it relates to the interpretation of the Umbrella Policy. Accordingly, no detailed choice-of-law analysis is required, and the Court will apply Ohio law to interpret the Umbrella Policy.[12] *See Gouge*, 252 F. Supp. 2d at 521; *Hayslip*, 420 F. Supp. 3d at 675; *Dharamsi*, 540 F. Supp. 3d at 753–54. For the same reasons, the Court will also apply Ohio law to interpret the Excess Liability Policy.

2.      *General Principles of Insurance Contract Construction Under Ohio Law*

Ohio courts review the interpretation of insurance policies as a matter of law. *Garlock v. Jordan*, 260 N.E.3d 42, 46 (Ohio Ct. App. 2025) (citation omitted). Under Ohio law, insurance contracts are construed in accordance with the same rules as other written contracts. *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 597 N.E.2d 1096, 1102 (Ohio 1992) (citations omitted). The role of the Court is "to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003) (citations omitted).

The traditional rules of contract interpretation are tools to discern the parties' intent. *See Sutton Bank v. Progressive Polymers, L.L.C.*, 163 N.E.3d 546, 551–52 (Ohio 2020) (citation omitted). "[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended[.]" *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978). "'[A] contract must be construed in its entirety and in a manner that does not leave any

---

[12] In any event, the law governing insurance contract interpretation is largely the same between Ohio and Georgia. *See generally Allied Prop. Cas. Ins. Co. v. Bloodworth Wholesale Drugs, Inc.*, 727 F. Supp. 3d 1404, 1411–12 (M.D. Ga. 2024) (summarizing general principles of Georgia insurance law).

16

phrase meaningless or surplusage.'" *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 363 (6th Cir. 2014) (quoting *Local Mktg. Corp. v. Prudential Ins. Co.*, 824 N.E.2d 122, 125 (Ohio Ct. App. 2004)).

Courts examine insurance contracts as a whole and presume that the intent of the parties is reflected in the language used in the policy. *Galatis*, 797 N.E.2d at 1261 (citation omitted). "When the policy language is clear, the court may look no further to find the intent of the parties." *Buehrer v. Meyers*, 155 N.E.3d 222, 226 (Ohio Ct. App. June 5, 2020) (quotation marks and citation omitted). "Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008) (citation omitted). "If provisions are susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured[,]" with exclusions "be[ing] interpreted as applying only to that which is *clearly* intended to be excluded." *Id.* (citations and quotation marks omitted) (emphasis in original). "[T]he insurer, not the insured, bears the burden of proving the applicability of an exclusion in its policy." *St. Marys Foundry, Inc. v. Emps. Ins. of Wausau*, 332 F.3d 989, 993 (6th Cir. 2003) (citing *Cont'l Ins. Co. v. Louis Marx Co.*, 415 N.E.2d 315, 317 (Ohio 1980)).

"An insurer's duty to defend is broader than and distinct from its duty to indemnify." *Ohio Govt. Risk Mgt. Plan v. Harrison*, 874 N.E.2d 1155, 1159 (Ohio 2007) (citations omitted). Because the Court's ruling on the insurers' duty to defend may be dispositive of their duty to indemnify, the Court addresses the duty to defend first.

17

3. *The Insurers' Duty to Defend*

Both National Union and XL argue that, as a matter of law, they have no duty to defend Davey Tree and Wolf Tree in connection with the underlying suits, thus entitling them to judgement on the declaratory judgment counts. (Doc. No. 50-1, at 9–11; Doc. No. 51-1, at 1–2.)

"The duty of an insurer to defend an insured is a broad duty[.]" *Granger v. Auto-Owners Ins.*, 40 N.E.3d 1110, 1115 (Ohio 2015) (citation omitted). "[W]hether an insurer has a duty to defend an action against an insured is initially determined by the scope of the pleading[,]" *M/G Transp. Servs., Inc. v. Water Quality Ins. Syndicate*, 234 F.3d 974, 977 (6th Cir. 2000) (citation omitted), and "is not determined by the action's ultimate outcome or the insurer's ultimate liability[,]" *Sharonville v. Am. Emps. Ins. Co.*, 846 N.E.2d 833, 837 (Ohio 2006) (citation omitted). "The duty of the insurer to accept the defense of a claim attaches whenever the complaint states a covered claim, or *potentially or arguably* does so." *M/G Transp. Servs., Inc.*, 234 F.3d at 977 (citation omitted) (emphasis in original). "The duty to defend is further heightened when the insurer expressly states that it will defend claims that are groundless, false, or fraudulent." *Sharonville*, 846 N.E.2d at 837 (citations omitted). "Once an insurer must defend one claim within a complaint, it must defend the insured on all the other claims within the complaint, even if they bear no relation to the insurance-policy coverage." *Id.* (citation omitted).

In examining the underlying complaint, courts must not "stretch the allegations beyond reason" such that it "effectively impose[s] an absolute duty upon the insurer to provide a defense to the insured[.]" *Cardiothoracic & Vascular Surgical Specialists, Inc. v. Travelers Indem. Co.*, No. 05AP-1355, 2006 WL 3805675, at *5 (Ohio Ct. App. Dec. 28, 2006) (citation omitted). "[T]he insurer has no duty to defend against any claim that is 'clearly and indisputably outside the

contracted policy language.'" *Lexington Ins. Co. v. DunnWell, LLC*, 69 N.E.3d 1066, 1081 (Ohio Ct. App. 2016) (citing *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 33 (Ohio 2007) (further citations omitted)).

### a.     Umbrella Policy

The Umbrella Policy contains a Defense Provision that obligates National Union "to defend any Suit against the Insured that seeks damages for Bodily Injury . . . covered by this policy, even if the Suit is groundless, false, or fraudulent when the applicable limits listed in Schedule of Retained Limits have been exhausted[.]" (Doc. No. 23-7, at 72–73.) "Bodily Injury" is defined as "bodily injury, sickness, disability or disease, *including death*[.]" (*Id.* at 79 (emphasis added).) Here, National Union alleges the $17.5 million aggregate Retained Limit had been exhausted. (Doc. No. 21 ¶ 58.) Additionally, the underlying suits plainly seek damages based on the insureds' alleged conduct leading to Montoya's death. (*See generally* Doc. No. 23-1; Doc. No. 23-2; Doc. No. 23-5.) The underlying suits therefore fall within the Umbrella Policy's broad Defense Provision.

National Union does not meaningfully dispute the fact that the underlying suits fall within the scope of the Defense Provision. Rather, National Union asserts that the ERP Exclusion bars coverage for the underlying suit. (Doc. No. 50-1, at 22.) Davey Tree and Wolf Tree disagree, contending that the ERP Exclusion is inapplicable. (*See* Doc. No. 56, at 24–43.) The parties' disagreements boil down to two issues: (i) whether the ERP Exclusion applies irrespective of Montoya's employment status; and (ii) whether the ERP Exclusion covers the allegations of the underlying suits.

"[W]hen an insurance contract contains exceptions to coverage, there is a presumption that all coverage applies unless it is clearly excluded in the contract." *Grange Indem. Ins. Co. v. Hinds*, 228 N.E.3d 714, 719 (Ohio Ct. App. 2023) (quotation marks and citation omitted) (alteration in original). Thus, "an exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded." *Id.* (citation omitted) (emphasis in original). In other words, "if an insurer wants to interpret a clause in an insurance contract so as to defeat coverage, 'it must demonstrate that the clause in the policy is capable of the construction it seeks to give it, and that such construction *is the only one* that can be fairly placed upon the language.'" *Scott Fetzer Co. v. Zurich Am. Ins. Co.*, 769 F. App'x 322, 326 (6th Cir. 2019) (quoting *Bosserman Aviation Equip., Inc. v. U.S. Liab. Ins. Co.*, 915 N.E.2d 687, 692–93 (Ohio Ct. App. 2009) (emphasis in original)). Therefore, the Court's inquiry is whether the ERP Exclusion *unambiguously* excludes coverage. Ambiguities in the terms of the insurance contract must be resolved in favor of the insured. *See Lager*, 896 N.E.2d at 669.

As will be discussed herein, the only reasonable interpretation of the ERP Exclusion is that it requires an employee relationship between the underlying claimant and the insured. The ERP does not *unambiguously* exclude coverage for claims made by non-employees. The Court therefore concludes that the ERP Exclusion cannot be invoked against Davey Tree because Montoya was not alleged to be its employee, or does there appear any such indicia of an employment relationship. The ERP Exclusion does, however, apply to bar coverage as it relates to Wolf Tree. The Court therefore finds that National Union has a duty to defend Davey Tree, but no duty to defend Wolf Tree.

   i.  *Whether the ERP Exclusion Applies Irrespective of Montoya's Employment Status*

The starting point for the Court's analysis is the contract language chosen by the parties. The ERP Exclusion denies coverage when the liability arises out of "employment-related practices, policies, acts, omissions or misrepresentations directed at a present, past, future or prospective employee[.]" (Doc. No. 23-7, at 12.) This applies "whether the Insured may be liable as an employer *or in any other capacity*[.]" (*Id.* (emphasis added).) Critically, the ERP Exclusion does not expressly state whether it applies when the underlying claimant (here, Montoya) is not the insured's employee.

National Union argues that the applicability of the ERP Exclusion hinges on the nature of the allegations giving rise to potential liability, not the employment status of the underlying claimant. (Doc. No. 50-1, at 31.) Because "there is no requirement in the ERP Exclusion that the employment-related practices be directed at an employee *of the insured*[,]" National Union contends that the Court need not make a finding as to whether Davey Tree was Montoya's actual or alleged employer for the ERP Exclusion to apply. (*Id.* at 34 (emphasis in original).) Rather, because the ERP Exclusion specifies that it applies "whether the Insured may be liable as an employer *or any other capacity*[,]" it can bar coverage irrespective of whether or not Davey Tree is alleged to have employed Montoya. (*Id.* at 35 (emphasis added).)

Davey Tree and Wolf Tree, meanwhile, contend that the ERP Exclusion only applies when the underlying claimant is alleged to have been an employee of the insured. (Doc. No. 56, at 24.) They argue that "[a]s a matter of logic and common sense, only an employer can engage in 'Employment Practices.'" (*Id.*) Moreover, they assert that the "any other capacity" language in the ERP Exclusion is meant to carve out liability for the "different capacities in which *the employer*

*itself* can be liable[,]" not that the ERP Exclusion could apply to non-employers. (*Id.* at 26.) The insureds contend that because Montoya is not alleged to have been an employee of Davey Tree, the ERP Exclusion cannot be invoked to deny coverage as to Davey Tree. (*See id.* at 29.)

In making their arguments, the parties rely on two lines of cases interpreting ERP exclusions—neither of which involve the application of Ohio law.

One line of cases, relied on by National Union, holds that "the focus [of the ERP exclusion] is on the potential claims, not the role of the insured." *Pac. Int'l Vegetable Mktg., Inc. v. Nationwide Agribusiness Ins. Co.*, 694 F. Supp. 3d 1185, 1192 (N.D. Cal. 2023). That case involved insurer Nationwide seeking a declaratory judgment that it had no duty to defend the insureds, Pacific International and Dynapac, in an underlying action involving allegations that the insureds engaged in unlawful employment practices. *Id.* at 1186–87. Pacific International was the parent company of Dynapac. *Id.* at 1187. Nationwide alleged that it had no duty to defend the insureds because the conduct alleged in the underlying action fell squarely within the governing insurance policy's ERP exclusion. *Id.* at 1190. Nationwide argued that the ERP exclusion could not apply to Pacific International because it was Dynapac, not Pacific International, who employed the claimant in the underlying suit. *Id.* at 1192. Applying California law, the Northern District of California concluded that the ERP exclusion at issue applied "whether the insured may be liable as an employer or in any other capacity." *Id.* The court assessed the nature of the underlying claims; on that basis, it ruled that "the ERP [e]xclusion applied to Pacific International in the [u]nderlying [a]ction, regardless of their status as an employer, because the [u]nderlying [a]ction necessarily and exclusively involved claims arising from employment practices." *Id.* at 1193. National Union cites several other cases which advance the same position: the applicability of the ERP exclusions

is based on the nature of the underlying claims, irrespective of the employment status of the claimant. (Doc. No. 50-1, at 34.)

Davey Tree and Wolf Tree, in turn, cite to another line of cases which holds that ERP exclusions are inapplicable absent an employer relationship between the underlying claimant and the insured. *See Standard Gen. L.P. v. Travelers Indem. Co. of Connecticut*, 261 F. Supp. 3d 502, 512 (S.D.N.Y. 2017). In *Standard Gen.*, insured Standard General brought a declaratory judgment action against insurer Travelers alleging that it had a duty to defend Standard General in an underlying suit brought by a third-party asserting claims for, *inter alia*, defamation, false light, and violations of California's Business & Professions Code. *Id.* at 504–05. Travelers argued that the harm alleged by the third-party was a "personal injury" that was excluded under the governing policies' ERP exclusion which applied "[w]hether the insured may be liable as an employer or in any other capacity." *Id.* at 510. The term "person," as used in the ERP exclusion, was undefined in the governing insurance policy. *Id.* The court noted that "[a]lthough that term may certainly be interpreted literally and broadly to mean <u>any</u> individual in the universe who suffers an employment-related 'personal injury,' the term could also reasonably be construed to refer to only those who have some former, current, or prospective employment relationship with the insured." *Id.* (emphasis in original). Concluding that the "language of this ERP exclusion is ambiguous"— and applying New York law requiring that "exclusions must be interpreted narrowly, and ambiguities as to the scope of the exclusion construed against the insurer"—the court found that the ERP exclusion was inapplicable because the underlying claimant lacked an employment relationship with the insured. *Id.* at 511–12. Davey Tree and Wolf Tree supplement their analysis

by citing other cases that limited similar exclusions to only claims made by former, current, or prospective employees of the insured. (Doc. No. 56, at 26.)

The Court finds that the only reasonable construction of the ERP Exclusion is that it requires an alleged employment relationship[13] between the underlying claimant and the insured. Although the ERP Exclusion applies "whether the Insured may be liable as an employer *or in any other capacity*[,]" it also specifies that the Umbrella Policy will not cover liability arising out of certain actions "directed at a present, past, future or prospective employee[.]" (Doc. No. 23-7, at 12.) The latter language is significant because it further specifies the scope of the ERP Exclusion. It also clearly distinguishes this contract from those in the out-of-circuit cases the parties' cite, which included no such limiting language. *See* Motion for Judgment on the Pleadings Exhibit B – Policy at 25, *Pac. Int'l Vegetable Mktg., Inc. v. Nationwide Agribusiness Ins. Co.*, No. 5:21-cv-9312 (N.D. Cal. Sept. 9, 2022), ECF No. 23-3; Decl. of Thomas A. Martin Ex. 3 – Commercial Excess Liability Insurance Policy at 9, *Standard Gen. L.P. v. Travelers Indem. Co. of Conn.*, No. 1:17-cv-548 (S.D.N.Y. June 15, 2017), ECF No. 26-3. In *Standard Gen.*, the court identified one possible interpretation of an *ambiguous* ERP exclusion to mean that it could only bar coverage for injuries sustained by "only those who have some former, current, or prospective employment relationship with the insured." 261 F. Supp. 3d at 510. Here, there is no ambiguity—the inclusion of near-identical language in the ERP Exclusion clearly indicates that it requires an alleged employment relationship between the underlying claimant and the insured.

The Court cannot construe a clause within a contract which would "leave any phrase [therein] meaningless or surplusage." *Eastham*, 754 F.3d at 363 (citation omitted). Adopting

---

[13] As used herein, "employment relationship" encompasses present, past, future, and prospective employment.

National Union's proposed interpretation would do just that. If the ERP Exclusion is read to apply irrespective of Montoya's employment status with the insureds, then the ERP Exclusion's language that it applies to conduct "directed at a present, past, future or prospective employee" would be rendered meaningless.

National Union argues that while the ERP Exclusion "requires that the employment-related practices be directed at an employee[14] . . . nowhere does it require that it must be directed at an employee *of the insured*." (Doc. No. 50-1, at 34 (citation modified) (emphasis added).) But this construction would interpret the contract "to yield absurd results[.]" *Ray v. Fifth Third Bank, N.A.*, 689 F. Supp. 3d 502, 511 (S.D. Ohio 2022) ("Indeed, courts hesitate to adopt such a result even when a contract's plain language seems to compel that answer." (citation omitted)), *aff'd*, No. 22-3387, 2023 WL 142443 (6th Cir. Jan. 10, 2023). Under National Union's construction, the ERP Exclusion could apply to practices directed at *any individual employed by anyone*. It strikes the Court as absurd that the ERP Exclusion would carve out coverage for conduct such as coercion, harassment, retaliation, and violation of civil rights *directed at anyone in the workforce*—even those who have no alleged employment relationship with the insureds. A more reasonable interpretation, and indeed the one more strongly supported by the language of the exclusion itself, is that the ERP Exclusion is limited to the universe of certain acts directed at "present, past, future or prospective employee[s]" of the insureds. The Court therefore finds that the ERP Exclusion requires an alleged employment relationship between the underlying claimant and the insureds.

---

[14] This is only partially correct; the ERP Exclusion states that it also applies to employment-related practices directed at past, future, and prospective employees. (Doc. No. 23-7, at 12.)

The existence of "in any other capacity" language does not alter the Court's conclusion. National Union argues that the ERP Exclusion's language that it applies "whether the Insured may be liable as an employer *or in any other capacity*" indicates that it can bar coverage irrespective of who employed Montoya. (*See* Doc. No. 50-1, at 31.) But National Union reads this language in isolation and ignores the other language in the ERP Exclusion limiting it to acts directed at "present, past, future or prospective employee[s]" of the insureds. Reading the contract as a whole, as the Court must, *see Galatis*, 797 N.E.2d at 1261 (citation omitted), the "in any other capacity" language must instead refer to the different ways an employee may seek to hold its employer liable. *See Standard Gen.*, 261 F. Supp. 3d at 511 (citation omitted) (applying New York law); *see also Amco Ins. Co. v. Chin*, No. CV 09-8140, 2010 LX 86749, at *25 (C.D. Cal. Mar. 15, 2010) (applying California law, finding that although an ERP exclusion used the term "in any other capacity," the remaining language of the ERP exclusion implies that the claim "must arise from the underlying plaintiff's current, former, or prospective employment with the insured"). This is the only possible interpretation that gives meaning to all terms of the EPR Exclusion while also being internally consistent.

Even if the Court were to find National Union's interpretation reasonable, this would at best suggest an ambiguity as to whether the ERP Exclusion can apply irrespective of the employment status of the claimant because the language of the ERP Exclusion "is susceptible of more than one reasonable interpretation." *Lager*, 896 N.E.2d at 669. The fact that the parties cite two lines of cases construing similar "in any other capacity" language in ERP exclusions differently supports a finding of ambiguity here. (*See* Doc. No. 50-1, at 31–32; Doc. No. 56, at 25–26); *see also St. Paul Mercury Ins. Co. v. F.D.I.C.*, 774 F.3d 702, 709 (11th Cir. 2014) (applying

26

Georgia law, noting that "an important indication of ambiguity in a policy is whether nearly identical or similar language has been construed differently by other courts" (citation omitted)). And, once a contract provision is identified as ambiguous, that provision "will be construed strictly against the insurer and liberally in favor of the insured." *Lager*, 896 N.E.2d at 669. Applying this principle here, the Court would reach the same conclusion—the ERP Exclusion is inapplicable when there is no alleged employment relationship between the insured and underlying claimant. *See Young v. Mesa Underwriters Specialty Ins. Co.*, No. 2:19-cv-3820, 2021 WL 650437, at *10 (S.D. Ohio Feb. 19, 2021) (applying Ohio law, concluding that insurance policy's ERP exclusion did not apply because it was not clearly intended to exclude coverage for non-employee unassociated third-parties of insured). In any event, the Court rejects National Union's proposed interpretation.

* * *

Having determined that the ERP Exclusion can only apply where there is an alleged employment relationship between the insured and the underlying claimant, the Court turns next to whether the underlying complaints allege any such employment relationship. As noted above, the Umbrella Policy contains a Separation of Insureds Provision; the Court must therefore assess the potential applicability of the ERP Exclusion separately as to Davey Tree and Wolf Tree. (*See* Doc. No. 27-1, at 21); *see also White*, 913 N.E.2d at 440 (O'Donnell, J., concurring) ("A severability clause provides that each insured will be treated independently under the policy." (quoting 2 Allan D. Windt, *Insurance Claims & Disputes* § 11:8 (5th ed. 2007)). For the Court to find that National Union has no duty to defend the insureds in the underlying suits, it must find that the ERP Exclusion *independently applies* to both Davey Tree and Wolf Tree. *Cf. Liberty Univ., Inc. v.*

27

*Citizens Ins. Co. of Am.*, 792 F.3d 520, 526 (4th Cir. 2015) (applying Virginia law, noting that a separation of insureds clause results in "[t]he insurer treat[ing] each insured as if he or she has separate insurance coverage, so that excluded conduct by one insured does not preclude claims brought by other insureds" (citations omitted)). In conducting this analysis, "[d]oubts in the pleadings regarding coverage, if any exist, must be resolved in favor of the insured rather than in a separate factual inquiry." *Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London*, 813 F. Supp. 576, 583 (N.D. Ohio 1993) (citing *Zanco, Inc. v. Michigan Mut. Ins. Co.*, 464 N.E.2d 513, 514 (Ohio 1984)). Applying these principles here, the Court concludes that the underlying complaints only allege Montoya's employment with Wolf Tree—not Davey Tree. Accordingly, the ERP Exclusion cannot apply to Davey Tree.

"[T]he pleadings['] mere use of the word 'employee' is not sufficient to invoke the [ERP] exclusion under the policy[.]" *Gen. Agents Ins. Co. of Am. v. Mandrill Corp.*, 243 F. App'x 961, 965 (6th Cir. 2007). Because "[an] allegation of 'employee' status in a complaint . . . could *potentially* have a different meaning than in the [Umbrella] Policy[,]" the Court must examine whether the complaint alleges an employment relationship as understood in the context of the Umbrella Policy. *See id.* (emphasis in original). Here, the Umbrella Policy does not expressly define the term "employee" or "employment relationship." (*See generally* Doc. No. 23-7.) In the absence of any express definition, the Court looks to the term's plain and ordinary meaning. *See Whitman v. Foremost Ins. Co.*, 656 F. App'x 75, 79 (6th Cir. 2016); *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995) (holding that, when an insurance policy does not define the term "employee," Ohio law requires courts to examine the term's plain and ordinary meaning).

Ohio has adopted the following definition for the plain and ordinary meaning of "employee":

> [A] person in the service of another . . . where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed . . . . One who works for an employer; a person working for salary or wages.

*Guman Bros. Farm*, 652 N.E.2d at 686–87 (citing *Employee,* Black's Law Dictionary 525 (6th ed. 1990)).[15]

In light of the above definition, the Court concludes that *only* Wolf Tree is sufficiently alleged to have employed Montoya. The insureds concede that Montoya is alleged in the underlying actions to have been employed by Wolf Tree. (Doc. No. 56, at 24 ("Montoya's employer was repeatedly alleged to be Wolf [Tree], not Davey [Tree]. And Wolf [Tree] was, in fact, Montoya's employer." (citations omitted)). Solely at issue is whether Montoya is alleged to have been an employee of Davey Tree.

The *Montoya* and *Huffman* pleadings are at best ambiguous as to whether Montoya is alleged to have been employed by Davey Tree. The underlying pleadings rely heavily on group pleadings and, as a result, the Court cannot distinguish what conduct is attributable to Wolf Tree and what conduct is attributable to Davey Tree. (*See, e.g.,* Doc. No. 23-1 ¶¶ 38 ("Wolf [Tree]/Davey [Tree] determined that Montoya needed to be terminated."), 43 ("Cruz created said 'paper trail' at the instruction of . . . Wolf [Tree] and Davey [Tree] in an effort to terminate Montoya."); Doc. No. 23-5 ¶¶ 60 ("Wolf Tree and Davey Tree corporate officers decided to have Rangel deal with Montoya directly."), 68 ("Wolf Tree and Davey Tree corporate officers

---

[15] Georgia has adopted a similar definition for the term "employee." *See, e.g., Royal v. Georgia Farm Bureau Mut. Ins. Co.*, 883, 777 S.E.2d 713, 715 (Ga. Ct. App. 2015) (citation omitted).

29

discuss[ed] how to build a paper trail to get rid of Montoya. A short time later, a Wolf Tree and Davey Tree corporate officer directed Cruz to cite Montoya with an 'unsatisfactory work' employee violation notice[.]"); 69 ("The alleged employee violation was baseless and concocted by Cruz, Branch and others acting on behalf of Wolf Tree and Davey Tree."), 80 ("Wolf Tree and Davey Tree's suspension of Montoya . . . .").) Given these intermingled allegations, the Court cannot find that Davey Tree is clearly alleged to have "[had] the power or right to control and direct [Montoya] in the material details of how the work is to be performed." Applying the rule that exclusions must be construed narrowly, *see Westfield Ins. Co. v. Hunter*, 948 N.E.2d 931, 935 (Ohio 2011), and that doubts in the pleadings regarding coverage must be resolved in favor of the insured, *see Sherwin-Williams Co.*, 813 F. Supp. at 583 (citation omitted), the Court finds that neither of the underlying complaints allege an employment relationship between Montoya and Davey Tree.

To summarize, the Separation of Insureds Provision requires the Umbrella Policy to be interpreted independently as to Davey Tree and Wolf Tree. The ERP Exclusion requires an alleged employment relationship between the insured and the underlying claimant. Here, neither the *Montoya* nor *Huffman* complaints adequately allege that Montoya was employed by Davey Tree. Accordingly, the Court holds that the ERP Exclusion cannot be invoked to deny coverage for the claims brought against Davey Tree. Because the Umbrella Policy arguably covers the claims in the underlying actions, National Union has a duty to defend Davey Tree unless and until it becomes apparent that coverage does not exist under the Umbrella Policy. *See Mandrill Corp.*, 243 F. App'x at 966; *Fireman's Fund Ins. Co. v. Hyster-Yale Grp., Inc.*, 135 N.E.3d 499, 507 (Ohio Ct. App. 2019).

ii.  *Whether the ERP Exclusion Covers the Allegations in the Underlying Suits*

The next issue is whether the ERP Exclusion covers the allegations in the underlying suits. This issue is only relevant for Wolf Tree because, as discussed above, Davey Tree is not covered by the relevant clause. The Court's analysis thus focuses on Wolf Tree.

The Umbrella Policy's ERP Exclusion provides that it "does not apply to any liability *arising out of*: . . . employment-related practices, policies, acts, omissions or misrepresentations . . . *including, but not limited to*: a. coercion, harassment, humiliation or discrimination; b. demotion, evaluation, reassignment, discipline, or retaliation; c. libel, slander, humiliation, defamation, or invasion of privacy; or d. violation of civil rights." (Doc. No. 23-7, at 12 (emphasis added).) The ERP Exclusion thus covers two categories of conduct. The first category is conduct that is expressly outlined in the ERP Exclusion.[16] But, because the conduct listed in the ERP Exclusion is not exhaustive, it also covers a second category of conduct that more broadly encompasses "employment-related practices, policies, acts, omissions, or misrepresentation." (*Id.*)

Moreover, the term "employment-related" is not defined by the Umbrella Policy. In accordance with the general principle that exclusions in insurance policies are to be construed narrowly, *see Hunter*, 948 N.E.2d at, 935, the Court finds that "'employment-related' cannot be synonymous with 'related to an employee' or 'involving an employee.'" *See Peterborough Oil Co. v. Great Am. Ins. Co.*, 397 F. Supp. 2d 230, 238 (D. Mass. 2005) (applying Massachusetts law). "If every injury arising out of an act that somehow related to an employee were to be excluded,

---

[16] "Under the principle of *ejusdem generis*, the [ERP Exclusion] should be held to extend solely to the same kind or class of items enumerated prior to the catch-all phrase." 3 Allan D. Windt, *Insurance Claims & Disputes* § 11:14A (6th ed. 2025). In other words, the forms of conduct expressly mentioned in the ERP Exclusion should not be construed in their widest meaning but instead must be plainly related to employment.

31

the exclusion would effectively swallow the coverage." *Id.* Instead, the term "employment-related" is more appropriately "intended to refer to matters that directly concern the employment relationship itself, such as the demotion, promotion, or discipline of employees by employers, and tortious acts that may accompany such personnel decisions, such as discrimination, harassment, or defamation." *Id.* at 238–39. Consequently, and contrary to the insureds' arguments otherwise (*see* Doc. No. 56, at 34–38), negligence may nevertheless fall within the scope of the ERP Exclusion so long as it is sufficiently related to the employment relationship. *See, e.g.*, *GNFH, Inc. v. W. Am. Ins. Co.*, 873 N.E.2d 345, 359 (Ohio Ct. App. 2007) (concluding ERP provision excluded coverage for underlying plaintiff's claims for negligent hiring and supervision); *Owners Ins. Co. v. William Benjamin Trucking, Inc.*, No. 22337, 2005 WL 1398836, at *3 (Ohio Ct. App. June 15, 2006) (concluding ERP endorsement excluded coverage for underlying plaintiff's claim for negligence because it "reli[ed], at least in part, upon the allegations [of retaliatory discharge, discrimination, and violations of public policy covered by the ERP endorsement]"); *cf. GrafTech Int'l, Ltd. v. Pac. Emps. Ins. Co.*, 101 N.E.3d 1271, 1276 (Ohio Ct. App. Dec. 28, 2017*)* (concluding pollution exclusion precluded coverage because underlying complaints alleged that insured's negligent conduct released toxic chemicals, having the effect of "making the environment impure, harmful, or dangerous").

The ERP Exclusion only carves out coverage for liability "arising out of" employment-related practices. The Supreme Court of Ohio has adopted a narrow interpretation of the term "arising out of" to mean "causing or contributing to the bodily injury for which coverage is sought." *Crow v. Dooley*, 2012 WL 2090078, at *4 (Ohio Ct. App. June 11, 2012) (quoting *Hunter*,

32

948 N.E.2d at 935) (citation modified).[17] "'[A]rising out of' does not mean merely occurring on or slightly connected with but connotes the need for a direct consequence or responsible condition." *Hunter*, 948 N.E.2d at 936. "For an exclusion that uses the term 'arising out of' to apply, there must be a causal relationship between the injury and what is excluded." *Cincinnati Specialty Underwriters Ins. Co. v. Larschied*, No. 1-14-01, 2014 WL 4672392, at *6 (Ohio Ct. App. Sept. 22, 2014) (citations omitted).

Wolf Tree advocates a narrower construction of the "arising out of" language. It argues that an intervening criminal act—here, Rangel's planned murder of Montoya—breaks the causal chain such that an insured's liability cannot "arise out of" the preceding criminal act. (Doc. No. 56, at 32–33.) In support, Wolf Tree cites to *Kish v. Cent. Nat. Ins. Grp. of Omaha*, 424 N.E.2d 288 (Ohio 1981), which concluded that an insured's murder did not "arise out of" the subject of the insurance policy's coverage. But *Kish* does not support the proposition that intervening criminal acts *necessarily* break the causal relationship between the injury and the insured.

*Kish* involved the interpretation of an automobile insurance policy's uninsured motorist provision. *Id.* at 289. The insured got into a motor vehicle accident and was murdered in an ensuing altercation with the uninsured driver of the other vehicle. *Id.* The insured's estate sued to recover under the insurance policy's uninsured motorist provision which entitled the insured to recover damages "arising out of the ownership, maintenance, or use of the uninsured vehicle." *Id.* at 293. The Ohio Supreme Court framed the inquiry as "whether the chain of events resulting in the

---

[17] *Crow* involved the interpretation of a policy exclusion, whereas *Hunter* involved the interpretation of a policy coverage provision. Although a concurring opinion in *Hunter* stated that "very different standards apply to the interpretation of a coverage provision than apply to the interpretation of an exclusion," 948 N.E.2d at 938 (Cupp, J., concurring) (explaining the coverage-versus-exclusion distinction in insurance law), subsequent Ohio cases have not made this distinction in the causation context. The Court also declines to make that distinction here.

accident was unbroken by the intervention of any event unrelated to the use of the vehicle." *Id.* at 294. The court concluded that "the intentional, criminal act of the murderer was an intervening cause of injury *unrelated to the use of the vehicle*" and therefore the insured's death did not arise "out of the ownership, maintenance, or use of the uninsured vehicle." *Id.* at 294–95 (emphasis added). That conclusion was based on the dissociation between the cause of the injury and the subject matter of the insurance provision, not on the criminality of the underlying conduct. *See Howell v. Richardson*, 544 N.E.2d 878, 882 (Ohio 1989) ("The focus of [*Kish*'s] holding was not the mental state of the tortfeasor but the instrumentality causing death."). The fact that an act is criminal, in and of itself, does not break the chain of causation. But when that act is unrelated to the contractual provision's specified subject matter, then it severs the causal chain such that the underlying act cannot be said to "arise out of" the subject matter of the insurance provision.

Applied here, the mere fact that Rangel's conduct was criminal does not automatically sever any causal relationship between Montoya's murder and Wolf Tree. The proper inquiry is instead whether Rangel's criminal conduct was so unrelated to employment-related practices such that it falls outside the scope of the ERP Exclusion.

\* \* \*

The Court's analysis of the *Montoya* and *Huffman* complaints is threefold. First, the Court identifies Wolf Tree's alleged conduct[18] in the underlying actions. Second, the Court determines whether the alleged conduct constitutes an "employment-related practice" as defined by the ERP

---

[18] "An insurer's duty to defend is determined by the facts as alleged, not the legal theory of liability asserted in the complaint." *GrafTech Int'l, Ltd.*, 101 N.E.3d at 1276 (citations omitted). Thus, the potential liability of National Union hinges on the alleged conduct attributed to Wolf Tree in the underlying *Montoya* and *Huffman* actions.

Exclusion. Finally, the Court assesses whether Montoya's death was a "direct consequence or responsible condition" of Wolf Tree's alleged conduct.

The *Montoya* complaint alleges that "[a]s early as 2015, Montoya began complaining to his supervisors of the problems [of Rangel's illicit conduct]." (Doc. No. 23-1 ¶ 21.) Montoya submitted an internal complaint which was reviewed by Davey Tree General Counsel Conner. (*Id.* ¶¶ 32–33.) Conner shared the complaint with Branch, who subsequently shared it with Rangel. (*Id.* ¶¶ 34–35.) Rangel thereafter "informed Montoya that he was in possession of the internal complaint, and that Montoya would regret ever sending the internal complaint." (*Id.* ¶ 36.) Rangel "continued to intimidate Montoya[.]" (*Id.* ¶ 37.) The complaint goes on to allege that, after Montoya was placed under the supervision of Cruz, "Cruz created [a] 'paper trail' *at the instruction of . . . Wolf [Tree]* . . . in an effort to terminate Montoya[,]" including fabricated safety violations. (*Id.* ¶¶ 43–45 (emphasis added).) The complaint alleges that Wolf Tree is responsible for the acts of Branch (*id.* ¶¶ 80–81) and Cruz (Doc. No. 23-3 ¶¶ 14–15) because they were acting within the scope of their employment. The complaint also alleges that Wolf Tree improperly disclosed Montoya's identity as the source of the employment complaints, failed to conduct an adequate investigation into Montoya's grievances, and failed to protect Montoya from foreseeable acts of retaliation and violence. (*Id.* ¶ 22.)[19] Finally, the complaint alleges that Wolf Tree's actions "were for the sole purpose of avoiding attention to [its] illegal practices." (Doc. No. 23-1 ¶ 82.)

The *Huffman* complaint alleges that, subject to the company's Whistleblower Reporting Policy, Wolf Tree employees were mandatory reporters of perceived violations of state or federal law committed by other Wolf Tree employees. (Doc. No. 23-5 ¶ 39.) The Whistleblower Reporting

---

[19] In the amended *Montoya* complaint, what should be paragraph 22 is mistakenly labeled as paragraph 19.

Policy further guaranteed that employees who submitted good-faith reports would be protected from actual or threatened retaliation. (*Id.* ¶ 40.) After Montoya filed two reports detailing perceived illegal activity (*id.* ¶¶ 43, 49), the complaint alleges that "each of the Defendants (including Wolf Tree) . . . , aided and abetted by each other, engaged in a systematic effort to silence Montoya[] through [threats], intimidation, retaliation, deception, and eventually murder." (*Id.* ¶ 53 (parenthetical added).) These retaliatory efforts were allegedly "intended to hinder, delay, dissuade, and prevent Montoya from reporting to, providing documents to, or testifying before law enforcement or official proceedings." (*Id.* ¶ 54.) Wolf Tree corporate officers allegedly "decided to have Rangel deal with Montoya directly." (*Id.* ¶ 60.) When Rangel began engaging in threatening and retaliatory action against Montoya, Wolf Tree "purposefully did nothing" even after being informed by Montoya. (*Id.* ¶ 62.) This was allegedly because "Rangel's retaliation against Montoya was sanctioned and aided by all other Defendants"—including Wolf Tree. (*Id.* ¶ 63.) Montoya was later issued a baseless employee violation "concocted by Cruz, Branch and others acting on behalf of Wolf Tree[.]" (*Id.* ¶ 69.) Wolf Tree "acted to silence Montoya" by suspending him from work. (*Id.* ¶¶ 79–80.)

Both the *Montoya* and *Huffman* actions are predicated on Wolf Tree's alleged retaliation against Montoya during the course of his employment. The complaints further allege that Wolf Tree's wrongdoing was not merely its failure to prevent misconduct by its employees (namely, Branch, Rangel, Cruz, and Conner). Rather, they claim that Wolf Tree played an active role in retaliating against Montoya by: (i) circulating Montoya's complaint; (ii) intentionally failing to intervene when Rangel threatened Montoya; (iii) instructing its employees to issue Montoya fabricated safety violations; and (iv) suspending Montoya. These allegations charge that Wolf Tree

engaged in a pattern of retaliation against Montoya during the course of his employment, facilitated through the conduct of other Wolf Tree employees. This places the alleged conduct squarely within the ERP Exclusion's express carve out of coverage for coercion, harassment, discipline, and retaliation. (*See* Doc. No. 23-7, at 12.)

Even if the complaints only alleged mere negligent conduct rather than retaliation, as Wolf Tree argues (*see* Doc. No. 56, at 37), the complaints still implicate "employment-related" practices or omissions and thus fall within the scope of the ERP Exclusion's non-exhaustive language. The underlying allegations pertain to Wolf Tree's mishandling of Montoya's complaint, failure to investigate, and failure to protect Montoya from foreseeable acts of retaliation and violence by its employees. Even if the underlying complaints did not allege that Wolf Tree directly retaliated against Montoya, these allegations are employment-related because they directly concern the employment relationship itself. *See Peterborough Oil Co.*, 397 F. Supp. 2d at 238 (interpreting "employment-related" to encompass "events concerning personnel management, employee discipline, and similar matters").

Although Ohio courts have not directly addressed the issue, other courts routinely find that injuries resulting from an insured employer's failure to take corrective action to protect its employee against a known danger are "employment-related," even when the insured employer did not directly sanction the harmful conduct. *See, e.g., Devine v. Great Divide Ins. Co.*, 350 P.3d 782, 792 (Alaska 2015) (applying Alaska law, finding that underlying plaintiff's alleged injury from assault by fellow employee "ar[ose] out of and in the course of his employment" with insured because insured "contributed to the episode by engendering, exacerbating, or facilitating the assault" by failing to supervise the assailant despite knowing his assaultive behavior); *Parts Inc.*

*v. Utica Mut. Ins. Co.*, 602 F. Supp. 2d 617, 622 (D. Md. 2009) (applying Maryland law, finding that underlying plaintiff's alleged bodily injury from battery and sexual harassment arose out of an employment-related omission because of insured's "failure to take immediate and appropriate corrective action when on notice of [its supervisory employee's] sexually harassing behavior"); *Agric. Ins. Co. v. Focus Homes, Inc.*, 212 F.3d 407, 411–12 (8th Cir. 2000) (applying Minnesota law, finding that underlying plaintiff's alleged sexual harassment injury was employment-related because insured residential treatment facility failed to take corrective action when insured's employees reported sexual misconduct of resident and instead "made unwanted sexual conduct from [resident] a condition of their employment" (quotation marks omitted)).

Here, Wolf Tree was on notice of Rangel's misconduct after having received Montoya's whistleblower complaints. As Montoya's alleged employer, it was in a position to insulate Montoya from potential retaliation or take corrective action against Rangel. But Wolf Tree took no such protective or corrective action. Wolf Tree's managerial decisions resulted in its employees committing tortious acts against Montoya—ultimately culminating in his murder. Wolf Tree's personnel management decisions (or lack thereof) are adequately "employment-related" and thus fit into the ERP Exclusion's non-exhaustive language.

Regardless of whether the underlying complaints allege retaliation or mere negligent conduct[20] by Wolf Tree, the *Montoya* and *Huffman* complaints allege the type of conduct covered by the ERP Exclusion. The final step is to determine whether the potential liability asserted in the

---

[20] Wolf Tree also argues that the ERP Exclusion does not apply to torts of general applicability, such as common-law negligence. (*Id.* at 37.) But the Court's inquiry at this juncture is focused on "the facts as alleged, not the legal theory of liability asserted in the complaint." *GrafTech Int'l, Ltd.*, 101 N.E.3d at 1276 (citations omitted). The mere fact that *Montoya* and *Huffman* assert negligence claims does not necessarily take them outside the scope of the ERP Exclusion.

underlying complaints "arise out of" "employment-related practices." The Court now must assess whether Montoya's death was a "direct consequence or responsible condition" of Wolf Tree's alleged retaliation campaign. *See Hunter*, 948 N.E.2d at 936 (citation omitted). The Court concludes that it was.

As discussed above, the underlying complaints allege that Wolf Tree engaged in a campaign of retaliation by: (i) circulating Montoya's complaint; (ii) intentionally failing to intervene when Rangel threatened Montoya; (iii) instructing its employees to issue Montoya fabricated safety violations; and (iv) suspending Montoya. It is not difficult to see how Wolf Tree's alleged conduct caused Montoya's death. The alleged circulation of Montoya's complaint and the disclosure of his identity caused Rangel to harbor grievances against Montoya. This, in turn, purportedly caused Rangel to retaliate against Montoya for reporting his illegal activity. Not only was Wolf Tree allegedly aware of Rangel's retaliatory conduct, but it also purposefully turned a blind eye to coerce Montoya's silence and quietly condoned Rangel's behavior. Rangel's retaliatory conduct culminated in Montoya's murder.

Wolf Tree's alleged conduct set into motion a causal chain that resulted in Montoya's death. To be sure, there is no allegation that Wolf Tree directly commissioned Rangel (and his accomplices) to murder Montoya. But Wolf Tree's alleged conduct laid the framework for Rangel's illicit actions. Wolf Tree's disclosure of Montoya's identity caused Rangel to retaliate against Montoya. And its implicit endorsement of Rangel's retaliatory conduct may have emboldened him to take increasingly extreme actions. The Court concludes that Wolf Tree's alleged conduct was a "direct consequence or responsible condition" of Montoya's murder. *See Jon Davler, Inc. v. Arch Ins. Co.*, 229 Cal. App. 4th 1025, 1039 (Cal. Ct. App. 2014) (applying

California law, finding that underlying plaintiffs' claims arose out of their employment with insured even though tortious conduct by plaintiffs' supervisor was not directly commissioned by insured).

Wolf Tree argues for a narrower construction of "direct consequence" such that it applies "*only* to the event without which the claim, and the damages sought, *would not exist*—here, Rangel's and his accomplices' murder of Montoya." (Doc. No. 56, at 33 (emphasis in original).) In other words, Wolf Tree contends that "direct consequence" refers to the last possible event in the causal chain that resulted in the loss.

But Ohio law imposes no such requirement. Wolf Tree cites to no case law that directly supports its proposed interpretation. While *Hunter* uses the term "direct consequence," it does not hold that this phrase exclusively refers to the singular event immediately preceding the loss. Instead, *Hunter* provides that "to satisfy the 'arising out of' exclusion in the policy, it would be necessary to show that [the subject of the exclusion] was causally related to the occurrence." 948 N.E.2d at 936. This suggests a looser causal relationship than what Wolf Tree advocates for. Indeed, several courts have found insurance exclusions to bar coverage even where the tortious act was committed by an uninsured third-party. *See, e.g.*, *Doe v. Sherwin*, No. 2013-P-0058, 2015 WL 3824019, at *4 (Ohio Ct. App. June 22, 2015) (concluding homeowner insurance policy's sexual molestation exclusion applied to exclude coverage to insured because, even though the sexual molestation was committed by an uninsured third-party, "[a]ll of the injuries alleged in plaintiffs' complaint, including those attributed to the negligence of [insured], *arose out of* [uninsured third-party's] alleged sexual molestation of plaintiffs' minor child" (emphasis added)); *Crow*, 2012 WL 2090078, at *5–6 (similar); *Westfield Ins. Co. v. Porchervina*, No. 2008-L-025, 2008 WL 5205662,

40

at \*5 (Ohio Ct. App. Dec. 12, 2008) (similar); *United Ohio Ins. Co. v. Myers*, No. 11-02-08, 2002 WL 31716117, at \*4 (Ohio Ct. App. Dec. 4, 2002) (similar); *Monticello Ins. Co. v. Hale*, 284 F. Supp. 2d 898, 908 (S.D. Ohio 2003) (concluding commercial liquor liability policy's assault and battery exclusion applied to exclude coverage to bar owners because plaintiffs' wrongful death claim "aros[e] out of" assault and battery, even though the decedent's death was caused by a shooting initiated by an uninsured third-party who was not employed by the bar), *aff'd,* 114 F. App'x 198 (6th Cir. 2004). Here, just as in those cases, Wolf Tree's alleged employment-related practices were causally related to Montoya's death, even if Rangel and his accomplices—parties not insured by the Umbrella Policy—were ultimately responsible for the final act of murder. And, consistent with *Kish* and *Howell*, the sole fact that Rangel's actions were criminal does not eliminate Wolf Tree from the chain of causation.

Neither is Wolf Tree's alleged conduct too remote to have been causally related to Montoya's death. Courts frequently find no causal relationship when the *type of injury* suffered is markedly different from the *subject-matter of the exclusion*. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Garcia*, 249 N.E.3d 737, 747 (Ohio Ct. App. July 25, 2024) (finding underlying individual's death from shooting by police officer was outside the scope of auto insurance policy because it did not "arise out of" ownership, maintenance, or use of the insured vehicle).[21] [22] But here, the

---

[21] *See also James River Ins. Co. v. Kemper Cas. Ins. Co.*, 585 F.3d 382, 387 (7th Cir. 2009) ("There are limits to what can be said to 'arise from' some event. But they are not based on unforeseeability. If Christopher Columbus had bought insurance against liability for claims arising out of his voyages and had later been sued for assaulting an Indian in Hispaniola, he could not have required the insurance company to defend him on the ground that had it not been for his voyage to Hispaniola he would not have assaulted anyone there.") (applying Illinois law).

[22] The insurance policy at issue in *Garcia* did not expressly use "arising out of" language. *See* 249 N.E.3d at 739. The court nonetheless noted that "[a]lthough Garcia's auto insurance policy does not require that an accident or injury *arise out of* . . . or *result from* the ownership, maintenance or use of a vehicle for liability coverage, the policy includes other causal language that clearly links the damages for which coverage is provided under the policy to the ownership, maintenance, or use of the vehicle as a vehicle." *Id.* at 747 (emphasis in original). Applying *Kish* and *Howell*, the court

connection between the ERP Exclusion and Montoya's death is not so attenuated. The ERP Exclusion carves out coverage for liability "arising out of . . . employment-related practices, policies, acts, omissions or misrepresentations directed at a present, past, future or prospective employee" and expressly covers retaliation. (Doc. No. 23-7, at 12.) Rangel, first directly and later indirectly through Cruz, allegedly exercised supervisory authority over Montoya. Rangel and Cruz allegedly used this authority to retaliate against Montoya after he filed his initial whistleblower complaint. This alleged retaliation escalated until Montoya was murdered. The Court finds that the type of injury is sufficiently connected with the subject-matter of the ERP Exclusion such that Wolf Tree's alleged conduct is causally related to Montoya's injury.

The Court concludes that the underlying actions seek to hold Wolf Tree liable for alleged conduct that is "clearly and indisputably outside the contracted policy language[.]" *See DunnWell, LLC*, 69 N.E.3d at 1081 (citations omitted). The allegations are plainly within the ambit of the ERP Exclusion, which expressly states that the Umbrella Policy does not apply to liability "arising out of . . . employment-related practices . . . including, but not limited to: . . . retaliation[.]" (*See* Doc. No. 23-7, at 12.) Because Wolf Tree's potential liability "arises out of" conduct described in the ERP Exclusion, the ERP Exclusion applies to bar coverage for the liability claimed in the underlying actions. Accordingly, under the Umbrella Policy's ERP Exclusion, National Union has no duty to defend Wolf Tree.

---

concluded that "[l]iability coverage does not exist under the policy where the vehicle was not the instrumentality of the harm." *Id.*

      *b.*      *Excess Liability Policy*

XL represents, and the insureds agree, that the Excess Liability Policy is a "follow form policy" based on the terms and conditions of the Umbrella Policy issued by National Union. (Doc. No. 51-1, at 2–3; Doc. No. 56, at 23 n.6.) Consequently, XL argues that it has no duty to defend Davey Tree and Wolf Tree for the same reasons articulated by National Union. (Doc. No. 51-1, at 4.) Davey Tree and Wolf Tree, meanwhile, contend that XL's motion for judgment on the pleadings should be denied because the Excess Liability Policy covers the underlying *Montoya* and *Huffman* suits. (Doc. No. 56, at 23 n.6.)

A follow form policy "'incorporates by reference the terms, conditions, and exclusions of the underlying policy.'" *Griewahn v. United States Fid. & Guar. Co.*, 827 N.E.2d 341, 347 (Ohio Ct. App. 2005) (quoting Richmond, *Rights and Responsibilities of Excess Insurers*, at 30–31 (2000)). Here, coverage is expressly premised on "[t]he terms conditions, definitions, limitations and exclusions of the [Umbrella Policy][.]" (Doc. No. 23-8, at 14.) The Excess Liability Policy further underscores that "[i]nsurance provided by this policy will not be broader than the insurance provided by the [Umbrella Policy]." (*Id.*) The terms and conditions of the Umbrella Policy are clearly incorporated into the Excess Liability Policy as if those terms and conditions were its own.

For the same reasons discussed above, XL cannot invoke the ERP Exclusion to deny its obligation to defend Davey Tree. But the ERP Exclusion does bar XL's coverage as it relates to Wolf Tree. XL is therefore entitled to declaratory judgment that it has no duty to defend Wolf Tree.

4.        *The Insurers' Duty to Indemnify*

Both National Union and XL also argue that they have no duty to indemnify Davey Tree and Wolf Tree in connection with the underlying suits. (Doc. No. 50-1, at 35–36; Doc. No. 51-1, at 4.)

"In contrast to a duty to defend, which looks to the allegations of a complaint (and, potentially, subsequent allegations), a duty to indemnify arises from the conclusive facts and resulting judgment of the underlying litigation." *NCMIC Ins. Co. v. Smith*, 389 F. Supp. 3d 535, 546 (S.D. Ohio 2019) (quotation marks and citations omitted). "[O]nce a duty to defend is recognized, speculation about the insurer's ultimate obligation to indemnify is premature until facts excluding coverage are revealed during the defense of the litigation and the insurer timely reserves its rights to deny coverage." *Erie Ins. Exch. v. Colony Dev. Corp.*, 736 N.E.2d 941, 946 (Ohio Ct. App. 1999) (citations omitted). But, should the Court find that there is no duty to defend, then there necessarily is no duty to indemnify. *See, e.g., Preferred Risk Ins. Co. v. Gill*, 507 N.E.2d 1118, 1124 (Ohio 1987) ("[A]ppellee has no duty to defend [insured] . . . . It follows that appellee has no obligation to indemnify [insured] in the event of an adverse judgment[.]"); *OTARMA v. Miami Twp.*, 210 N.E.3d 665, 668 (Ohio Ct. App. 2023) ("Given that an insurer's duty to defend is broader than its duty to indemnify, the absence of a duty to defend necessarily means there is no duty to indemnify." (citation omitted)); *AIX Specialty Ins. Co. v. Big Limo, Inc.*, 547 F. Supp. 3d 757, 762 (S.D. Ohio 2021) ("[I]f there is no duty to defend, it follows that there is no duty to indemnify." (citing *Maxum Indem. Co. v. Robbins Co.*, 784 F. App'x 366, 371 (6th Cir. 2019))).[23]

---

[23] The insureds contend that the insurers may still owe a duty to indemnify even if they do not have a duty to defend. (Doc. No. 56, at 42.) In support, they cite a single Ohio trial court case in which the court granted partial summary judgment for an insurer after finding that no duty to defend existed, but denied the motion to the extent the insurer

44

Here, National Union's and XL's arguments that they have no duty to indemnify Davey Tree and Wolf Tree are premised on a finding that there is no duty to defend. (Doc. No. 50-1, at 35–36 ("Because National Union has no duty to defend, it necessarily means it has no duty to indemnify and judgment on the pleadings is warranted on the duty to indemnify as well.").) But the Court has determined that the ERP Exclusion does not entitle National Union and XL to declaratory judgment that they have no duty to defend Davey Tree in connection with the underlying suits. And the Court will not speculate as to each party's ultimate duty to indemnify until the factual record of the underlying suits is thoroughly established. *See Erie Ins. Exch.*, 736 N.E.2d at 946. Consequently, the Court declines to enter judgment on the pleadings that National Union and XL have no duty to indemnify Davey Tree in connection with the underlying suits.

Regarding Wolf Tree, the Court has concluded neither National Union nor XL have a duty to defend because the ERP Exclusion carves out coverage. Because there is no duty to defend Wolf Tree, there necessarily is no duty to indemnify Wolf Tree. *See Gill*, 507 N.E.2d at 1124. Accordingly, the insurers are entitled to judgment on the pleadings that they have no duty to indemnify Wolf Tree.

## B. Breach of Contract Claims Against National Union and XL

The insurers seek judgment on the pleadings as to the insureds' claims that National Union and XL breached the Umbrella Policy and Excess Liability Policy, respectively, by failing to defend and indemnify the insureds in the underlying *Montoya* and *Huffman* suits. (Doc. No. 50-1,

---

sought a declaration that there was no duty to indemnify. *See Orthopedic & Neurological Consultants v. Cincinnati Ins. Co.*, No. 16-cv-5552, 2017 Ohio Misc. LEXIS 426, at *5 (Franklin Cty. Ct. Com. Pl. May 8, 2017).

The Court is unpersuaded that there can be a duty to indemnify in the absence of a duty to defend. The holding in *Orthopedic & Neurological Consultants* runs contrary of the overwhelming number of Ohio cases which conclude that there can be no duty to indemnify if there is no duty to defend.

45

at 9; Doc. No. 51-1, at 1.) The insureds contend that the insurers "ha[d] breached [their respective insurance policies] by failing to defend and indemnify [the insureds] in connection with *Montoya*, *Huffman*, *ComEd*,[24] and *Johnson*[25] matters[.]" (Doc. No. 23, at 77, 89 (citation modified).)

The movant bears the burden of establishing entitlement to judgment on the pleadings. *See Winget*, 510 F.3d at 581. But here, the insurers make no arguments regarding the breach of contract claims in their briefing in support of their respective motions for judgment on the pleadings. (*See generally* Doc. No. 50; Doc. No. 51; Doc. No. 58; Doc. No. 59.) It is not the Court's role to construct the insurers' legal arguments for them. *See Grover v. BMW of N. Am., LLC*, 581 F. Supp. 3d 930, 950 (N.D. Ohio 2022) (citations omitted). The insurers therefore have not established entitlement to judgment on the pleadings as to the insureds' breach of contract claims.

## C. Bad Faith Claim Against National Union

Lastly, National Union seeks judgment on the pleadings as to the insureds' counterclaim that it failed to act in good faith by failing to timely reimburse the insureds in accordance with the terms of the Umbrella Policy. (*See* Doc. No. 50-1, at 9.) National Union argues that the insureds' counterclaims must fail in the absence of coverage in the underlying actions. (*See id.* at 36–37.) National Union only seeks judgment on the pleadings "insofar as it is based upon the *Montoya* [a]ction and/or *Huffman* [a]ction." (Doc. No. 50-1, at 36 n.7 (emphasis added).)[26]

---

[24] *ComEd* refers to the lawsuit captioned *Commonwealth Edison Co. v. Davey Resource Group, et al.*, a case currently pending in the Northern District of Illinois. (*See* Doc. No. 23, at 71.) In that case, the plaintiff alleges contractual indemnity, breach of contract, and contribution against Davey Tree. *See generally* Third Amended Compl., *Commonwealth Edison Co. v. Davey Resource Group, et al.*, No. 1:23-cv-1336 (N.D. Ill. July 10, 2024), ECF No. 85.

[25] *Johnson* refers to *Johnson v. InTown Suites of Coon Rapids, LLC, et al.*, a case that was before a Minnesota state court. (*See* Doc. No. 23, at 74.) As of June 3, 2025, *Johnson* settled. (*Id.* n.2.)

[26] The insureds argue that their bad faith claim "goes beyond the two underlying [*Montoya* and *Huffman*] suits, to implicate a broader pattern of conduct" and therefore the Court cannot assess their good faith claim solely as to the *Montoya* and *Huffman* actions. (*See* Doc. No. 56, at 43.) But this Court's determination that National Union has no

The insureds' bad faith claim, asserted only against National Union, contends that "[National Union] breached [its duty to act in good faith] . . . by failing to timely reimburse [the insureds] in full and without reservation for Loss exceeding the Retained Limit, which [the insureds] ha[ve] incurred for covered claims, including *Montoya*, *Huffman*, *ComEd*, and *Johnson*, without justification and in an arbitrary and capricious manner." (Doc. No. 23, at 79.)

Under Ohio law, "[a]n insurer has the duty to act in good faith in the handling and payment of the claims of its insured." *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983). "[A]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994) (citation omitted). "Where a claim is fairly debatable[,] the insurer is entitled to refuse the claim . . . as long as such refusal is premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim." *Marshall v. Colonial Ins. Co.*, No. 15 MA 0169, 2016 WL 7290968, at *15 (Ohio Ct. App. Dec. 9, 2016) (quoting *Motorists Mut. Ins. Co. v. Said*, 590 N.E.2d 1228, 1236 (Ohio 1992), *overruled on other grounds by Zoppo*, 644 N.E.2d 397) (quotation marks omitted).

The absence of coverage is fatal to an insured's bad faith claim against its insurer. *See Torre Rossa, LLC v. Liberty Mut. Ins. Co.*, No. 1:20-cv-1095, 2021 WL 4519585, at *6 (N.D. Ohio Sept. 30, 2021) (dismissing plaintiff's breach of contract claim because she did not plausibly allege entitlement to coverage under the insurance policy, and in turn dismissing plaintiff's bad faith

---

duty to defend or indemnify Wolf Tree implies that that National Union did not act in bad faith in denying coverage as to Wolf Tree. The Court does not need to assess any "broader pattern of conduct" to make this determination.

claim because she did not plausibly plead a breach of contract); *Dutch Maid Logistics, Inc. v. Acuity*, Nos. 91932 & 92002, 2009 WL 1019857, at *5 (Ohio Ct. App. April 16, 2009) (affirming district court's denial of plaintiff's motion to compel discovery for a bad faith claim "[b]ecause any bad faith claim hinged on the initial determination of the coverage issues"). Here, having found that insurers have no duty to defend or indemnify Wolf Tree, Wolf Tree cannot sustain its bad faith claim against National Union. Accordingly, National Union is entitled to judgment that it cannot be held liable by Wolf Tree for failing to act in good faith, but only to the extent the claim is based on the *Montoya* and *Huffman* actions.[27]

As for Davey Tree's claim of bad faith, the Court cannot at this stage determine whether National Union has engaged in bad faith by failing to reimburse Davey Tree. Bad faith is generally a question of fact. *See Gregerson v. Farm Bureau Prop. & Cas. Ins. Co.*, 462 F. Supp. 3d 952, 968 (D.S.D. 2020) (applying South Dakota law) (quotation marks and citation omitted); 44A Am. Jur. 2d *Insurance* § 1698 (2026). It would not be appropriate for the Court to act as the factfinder, at this stage, to determine whether National Union's conduct was "premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim." *See Marshall*, 2016 WL 7290968, at *15. Accordingly, the Court cannot grant National Union judgment on the pleadings on the issue of bad faith as it pertains to Davey Tree.

---

[27] The Court makes no ruling as to whether National Union failed to act in good faith as to the *ComEd* or *Johnson* matters.

## IV.    CONCLUSION

The allegations in the complaint fall squarely within the Defense Provision of National Union's Umbrella Policy. The only reasonable interpretation of the Umbrella Policy's ERP Exclusion is that it requires the underlying claimant to have an alleged employment relationship with the insureds. Because neither of the *Montoya* or *Huffman* complaints allege that Montoya was an employee of Davey Tree, and because the Separation of Insureds Provision requires the Umbrella Policy to be interpreted separately and independently as to Davey Tree and Wolf Tree, the Court concludes that National Union cannot rely on the ERP Exclusion to deny coverage to Davey Tree. Absent any other applicable exclusion, and until it becomes apparent that coverage does not exist under the Umbrella Policy, National Union has a duty to defend Davey Tree.

As for Wolf Tree, because the underlying actions allege that Montoya was employed by Wolf Tree, and because the underlying complaints allege that Wolf Tree's potential liability "arise[s] out of" employment-related conduct, the Court finds that the ERP Exclusion applies. The ERP Exclusion bars coverage as to Wolf Tree. National Union has no duty to defend Wolf Tree.

At this stage of proceedings, the Court can find no duty to indemnify only if there is no duty to defend. The Court concludes that, because National Union has no duty to defend Wolf Tree, it also has no duty to indemnify Wolf Tree. Conversely, because National Union has a duty to defend Davey Tree, the Court cannot conclude that it has no duty to indemnify Davey Tree.

As to XL, the Excess Liability Policy is a follow form policy based on the terms and conditions of the Umbrella Policy. For the same reasons and absent any other applicable exclusion, XL has a duty to defend Davey Tree after the applicable limits of the Umbrella Policy have been exhausted and has no duty to defend or indemnify Wolf Tree.

Accordingly, National Union's and XL's motions for judgment on the pleadings (Doc. No. 50; Doc. No. 51) are **GRANTED in part** and **DENIED in part** as follows:

1. As to Davey Tree:

   a. National Union's motion for judgment on the pleadings is **DENIED** as to Count I (Duty to Defend and Indemnify) of its first amended complaint, and **DENIED** as to Counts I (Duty to Defend and Indemnify), II (Breach of Contract), and IV (Bad Faith) of the insureds' counterclaims;

   b. XL's motion for judgment on the pleadings is **DENIED** as to Count I (Duty to Defend and Indemnify) of its counterclaim, and **DENIED** as to Counts I (Duty to Defend and Indemnify) and II (Breach of Contract) of the insureds' third-party complaint.

2. As to Wolf Tree:

   a. National Union's motion for judgment on the pleadings is **GRANTED** as to Count I (Duty to Defend and Indemnify) of its first amended complaint, **GRANTED** as to Counts I (Duty to Defend and Indemnify) and IV (Bad Faith) of the insureds' counterclaim, and **DENIED** as to Count II (Breach of Contract) of the insureds' counterclaim;

   b. XL's motion for judgment on the pleadings is **GRANTED** as to Count I (Duty to Defend and Indemnify) of its counterclaim, **GRANTED** as to Count I (Duty to Defend and Indemnify) of the insureds' third-party complaint, and **DENIED** as to Count II (Breach of Contract) of the insureds' third-party complaint.

Consistent with the above, Counts I (Duty to Defend and Indemnify) and IV (Bad Faith) of the insureds' counterclaim, as asserted by Wolf Tree, are **DISMISSED with prejudice**. Count I (Duty to Defend and Indemnify) of the insureds' third-party complaint, as asserted by Wolf Tree, is **DISMISSED with prejudice**.

   **IT IS SO ORDERED**.

Dated: August 5, 2026

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

50